WILLIAM E. WOODRUFF, PLAINTIFF IN ERROR, *v.* FREDERICK W. TRAPNALL.

In 1836, the legislature of Arkansas chartered a bank, the whole of the capital of which belonged to the State, and the president and directors of which were appointed by the General Assembly.

The twenty-eighth section provided, "that the bills and notes of said institution shall be received in all payments of debts due to the State of Arkansas."

In January, 1845, this twenty-eighth section was repealed.

The notes of the bank which were in circulation at the time of this repeal, were not affected by it.

The undertaking of the State to receive the notes of the bank constituted a contract between the State and the holders of these notes, which the State was not at liberty to break, although notes issued by the bank after the repeal were not within the contract, and might be refused by the State.

Therefore, a tender, made in 1847, of notes issued by the bank prior to the repealing law of 1845, was good to satisfy a judgment obtained against the debtor by the State; and it makes no difference whether or not the debtor had the notes in his possession at the time when the repealing act was passed.

THIS case was brought up, by writ of error, from the Supreme Court of the State of Arkansas.

On the 2d of November, 1836, the State of Arkansas passed an act to incorporate the Bank of the State of Arkansas. The capital was one million of dollars, which was raised by a sale of the bonds of the State, or by loans founded upon those bonds. The president and directors were appointed by a joint vote of the General Assembly. All dividends upon the capital stock were declared to belong to the State, subject to the control and disposal of the legislature.

The twenty-eighth section was as follows, viz. : — " That the bills and notes of said institution shall be received in all payments of debts due to the State of Arkansas." The other

sections of the act were in the usual form of conferring general banking powers.

In 1836, William E. Woodruff was elected by the General Assembly of Arkansas Treasurer of the State, and on the 27th of October, 1836, executed a bond to James S. Conway, Governor of the State, in the penal sum of three hundred thousand dollars, conditioned for the faithful performance of his duties as treasurer.   There were seven sureties, whose names it is not necessary to mention.   The time for which Woodruff was to serve was two years, " and until his successor shall be elected and qualified."   His term of office was thus from the 27th of October, 1836, to the 25th of December, 1838.

On the 23d of March, 1840, the State of Arkansas brought a suit upon this official bond against the principal and sureties in the Pulaski Circuit Court.   The breach alleged was, that Woodruff had not paid over to his successor the sum of $ 2,395.18.   It is not necessary to trace the history of this suit; suffice it to say, that it eventuated in a judgment against Woodruff for $ 3,359.22 and costs.

On the 10th of January, 1845, the legislature passed an act relating to the revenue of the State, the nineteenth section of which provided that, " from and after the 4th of March, 1845, nothing shall be received in payment of taxes or revenue due the State, but par funds."

In the progress of the suit, Frederick W. Trapnall had become regularly substituted in place of the Attorney-General, to conduct the suit.

In 1847, Trapnall ordered an execution upon the judgment which the State had obtained against Woodruff, who, on the 24th of February, 1847, tendered and offered to pay to Trapnall the sum of $ 3,755 in the notes issued by the Bank of the State of Arkansas, which Trapnall refused to receive.

On the 25th of February, 1847, Woodruff filed a petition in the Supreme Court of the State, praying for an alternative writ of mandamus, commanding Trapnall to " receive and accept, in payment of the judgment, the notes of the Bank, or to show cause why he shall refuse to do so."   The writ was issued accordingly.

To this writ the following answer was filed : —

" The answer of Frederick W. Trapnall, attorney for the State *pro tem.*, to an alternative mandamus hereto annexed, issued by the Supreme Court on the petition of William E. Woodruff.

" This respondent admits the judgment and tender as set out in the said petition, but alleges that he was not authorized to

receive the said Arkansas State Bank notes; because the twenty-eighth section of the bank charter, under which alone the said Woodruff could claim a right so to satisfy the said judgment, was repealed by an act of the legislature of the State of Arkansas, approved January 10, 1845, and entitled, " An Act making appropriations for the years 1845, 1846, and part of the year 1844, and for balances due from the State, and for other purposes," and by the nineteenth section of the said act.

" And this respondent submits to the court, if the repeal of the said section does not deprive him of all authority to receive the said bank-notes from the said Woodruff in satisfaction of the said judgment in favor of the State of Arkansas against him and others. Respectfully,

" FREDERICK W. TRAPNALL."

To this answer Woodruff demurred, and there was a joinder in demurrer.

Before the argument, the following agreement was filed by the counsel of the respective parties.

" Be it remembered, that the following matters are agreed upon by the counsel for the petitioner and respondent in this cause, to the end that the same may be filed and become a part of the record herein.

" 1st. The record and proceedings in the case of William E. Woodruff, and the said persons named in said petition as his securities, against the State of Arkansas, upon the first and second writs of error remaining in this court, and which are referred to in said petition, shall form a part thereof by such reference, as fully as though the same were incorporated therein at full length.

" 2d. That said respondent, as attorney of record for said State in the suit aforesaid, is the proper officer by law to receive and acknowledge satisfaction of said judgment.

" 3d. That the notes of the Bank of the State of Arkansas, referred to in said petition and response, and tendered in this case, were issued by said bank, pursuant to the charter thereof, prior to the year 1840.

" 4th. That after the creation of said bank, down to the year 1845, the notes of said bank were received and paid out by said State in discharge of all public dues to and from said State.

" 5th. That said bank continues to exist, with all its corporate functions, and that in the consideration of this case all the acts of the General Assembly of said State, affecting said bank, shall be deemed to be public laws, as they have been heretofore decided by this court to be, and whereof this court will judi-

cially take notice; but to the end thereof, and for greater certainty, the act of said General Assembly, entitled ' An Act to incorporate the Bank of the State of Arkansas,' approved November 2d, 1836, is here inserted at full length, and made part of the record in this cause, and which act of incorporation is in the words following." (Then followed the charter of the bank *in extenso*.)

One of the grounds of the demurrer was the following: —

" 1st. That the nineteenth section of said act, entitled ' An Act making appropriations for the years 1845, 1846, and part of the year 1844, and for balances due from the State, and for other purposes,' approved January 10th, 1845, is a law impairing the obligation of contracts, and is repugnant to the Constitution of this State and of the United States, and therefore void."

On the 28th of July, 1847, the Supreme Court of Arkansas overruled the demurrer, and on the 30th of July Woodruff sued out a writ of error to bring the case up to this court.

It was argued by *Mr. Lawrence* and *Mr. Reverdy Johnson*, for the plaintiff in error, and by *Mr. Sebastian*, for the defendant in error.

The following extract from the brief filed by *Mr. Lawrence* shows the ground upon which he placed his argument. Of the argument of *Mr. Johnson*, the reporter has no notes.

The question presented is an important one. It is whether, under the Constitution of the United States, a State can violate her solemn pledges, break her plighted word, and annul her sacred and deliberate contracts and promises. One would think it not a difficult question; and surely we should have supposed the mere statement of it enough, without a word of argument, had not the highest tribunal of a State decided in favor of this monstrous power, and announced principles which, as it seems to us, are at variance with sound, well-settled, and universally admitted principles of constitutional and national morals.

We say the question is an important one. It is, whether States and sovereignties are governed by the rules of ordinary honesty; whether the provision in the Constitution, that the obligation of contracts shall by no law be impaired, is mere *brutum fulmen.* For there is no doubt that private honesty cannot long survive when public dishonesty is legalized; that private promises and obligations will not long be held sacred, when the judiciary, the guardian of the public morals, admits and argues that the State may, at pleasure, violate her pledges and promises; that public and private morals are intimately connected; and that a despotic government, that kept her faith

and held her pledge and promise sacred and inviolable, would be far preferable to a republic whose promises were but ropes of sand, her public faith a mockery, and her plighted honor the mere oath of a dicer.

The Supreme Court of Arkansas denies that the twenty-eighth section of the charter so incorporated itself into the contract as to become a part of it, and holds such a position fallacious. One would think, on the contrary, it was self-evident. That court says that the position is a fallacy, because " the act by which the State Bank was created was nothing more than a grant of power for certain purposes therein specified, which was exclusively under the control of the legislature, and consequently subject to be repealed at any time, whenever, in the wisdom of that body, it should seem expedient for the good of the country." That, so far as it means that the legislature could repeal the charter, and end the existence of the bank, we admit. But the court proceeds to say that, on such repeal, the notes of the bank would become valueless, and the debt evidenced by them extinguished. And they further assert, that the provision allowing the debtors of the State to pay in notes of the bank was a mere *gratuity;* a privilege, on condition they should pay before the repeal of the law.

This is the whole argument, or rather series of assertions, used by the court. It assumes that a repeal of the act would repeal, and could constitutionally repeal, the promise and pledge contained in the twenty-eighth section; that, indeed, it is no pledge, but a privilege gratuitously conferred, on condition the law was not repealed. Now, is this true? At first blush, it would seem extraordinary that any such conclusion could ever have been arrived at. If an individual was about to issue his notes to serve as currency, would it be a *gratuity* if he promised to receive them in payment of debts due him? It might just as well be said that his promise to pay them was a gratuity. One would be just as much a gratuity as the other.

Suppose A wishes to induce me to loan money to B, and take for it his note, and, in order to do so, tells me that, if I will loan the money on B's giving me his note for the amount, he (A) will, at any time, receive it in payment of any debt I, or any holder of it, may owe him. Suppose he puts this in writing, and seals it. Is this promise a gratuity? On the contrary, it is a valid promise, for a good and valuable consideration. If it is not, in every case where a man becomes security for another, it is a gratuity. If we need an apology for quoting authorities to sustain a self-evident proposition, lying on the very surface of the law, it must be found in the fact that so

trite and common and fundamental a principle is actually de-
nied by the Supreme Court of a State.

That such a promise is not a gratuity, but a valid contract,
for good consideration, was established before cases were re-
ported. It is repeated in a multitude of cases, and denied no-
where. Baily v. Croft, 4 Taunt. 611 ; Suffield v. Bruce, 2 Stark.
175; Brown v. Garbrey, Gouldsb. 94 ; Kirkby v. Coles, Cro.
Eliz. 137 ; Stadt v. Dill, 9 East, 348 ; Leonard v. Vredenburgh,
8 Johns. 29 ; Hunt v. Adams, 5 Mass. 362 ; Howe v. Ward,
4 Greenl. 195; Minet's Case, 14 Ves. 189 ; Violett v. Patton,
5 Cranch, 142, 152.

The twenty-eighth section of the charter of this bank is not
a law, in any sense of the word. Municipal law is a rule
of civil conduct prescribed by the supreme power of a state.
(1 Kent, 446.) Statute law is the express written will of the
legislature, rendered authentic by certain prescribed forms and
solemnities. (Ibid.) The word *law*, in its most general and
comprehensive sense, signifies a rule of action (1 Bl. Com. 38) ;
a rule of action prescribed by some supreme being. (Ibid.) Mu-
nicipal law is a rule of civil conduct, prescribed by the supreme
power in a state (1 Bl. Com. 46), commanding what is right,
and prohibiting what is wrong. (Ibid. 53.) The operation of
a law must be from the supreme power or state, upon the indi-
viduals or corporations, or some of them, composing it. It
must be an exercise of the power of government. If I order a
child to learn a task, that is a law ; but if I, at the same time,
promise him a reward for doing it, this is no law, but a prom-
ise. It is no exercise of the paternal power. An act of the
legislature may be in part a law and in part a contract. So
far as it is a contract or promise, founded on a valid consider-
ation, it binds the state just as it does an individual ; and the
former can no more repeal such a contract than an individual
can repeal his bond.

It is perfectly well settled in this court, that a legislative act
may be a contract, and that whenever it is so, and absolute
rights have vested under that contract, a repeal of the law can-
not divest these rights ; and that, if the act of annulling them
is legitimate, it is rendered so by a power applicable to the
case of every individual in the community. Fletcher v. Peck,
6 Cranch, 135.

It is too well settled, by too many cases in this court and
elsewhere, that a legislative grant is a contract, to argue that ;
why it is a contract, is equally well settled. The *indicia* of a
contract between a state and individuals are the same as be-
tween man and man. If a grant, which is a gratuity, is a
contract, because it vests a right, *a fortiori* is the promise in

this case — for it is no gratuity, but a valuable promise — a good and valuable consideration. By this promise the State became the surety of the bank, as to all the paper that institution might issue. Certainly a suretyship, based on, and supported by, a consideration good in law, is a contract, and one of the highest obligation. It is not necessary to argue whether it is executed or executory. In either case it contains obligations binding on the parties. Fletcher v. Peck, 6 Cranch, 137.

It is far from being true, that every act which a State does, she does as sovereign. When she takes stock in a banking corporation, she assumes the character of an individual, and as such is subject to all the ordinary obligations which could be incurred by an individual under like circumstances.

Certainly no court will deny the capacity of a State to contract with other States, or with her citizens or citizens of other States. Sovereignty of course includes that power and capacity. If competent to contract, she may do it by a legislative enactment, or by a contract executed by her agents in pursuance of a law, or by implication. And if she can contract at all, the twenty-eighth section of this charter is unquestionably a contract. The grant of a franchise to one corporation is an implied contract that the State will not confer the identical franchise on another corporation, and this implied contract is rendered irrevocable by the Constitution. Dartmouth College v. Woodward, 4 Wheaton, 518.

Two parties are necessary to form a perfect contract, but the assent of both need not be given at the same time. Judge Story gives, as an instance to prove this, in Dartmouth College v. Woodward, an act declaring that all persons, who should thereafter pay into the public treasury a stipulated sum, should be tenants in common of certain lands belonging to the State, and declares that to be clearly a contract with a person afterwards born, who should pay the stipulated sum into the treasury. Would he not have given quite as strong an instance, if he had said that a promise by a State to receive certain paper, about to be issued in payment of all debts due her, was a contract with every person who should afterwards take it, that she would receive it from them ? Undeniably, this position would have needed as little argument as the other. Both are too plain to admit of argument.

That agreements between two States constitute a contract within the meaning of the Constitution, was expressly held in Green v. Biddle, 8 Wheaton, 1. The definition there given of a contract is, that it is an agreement to do or not to do certain acts, and it is said expressly that the Constitution of the United States embraces all contracts, executed or executory, whether

between individuals or between a State and individuals; and that a State has no more power to impair an obligation into which she herself has entered, than to impair the contracts of individuals. The same principle was declared in Briscoe v. Bank of Commonwealth of Kentucky, 11 Peters, 257; Providence Bank v. Billings, 4 Peters, 514.

In the State of New Jersey v. Wilson, 7 Cranch, 165, it was held that a legislative act, declaring that land which should be purchased for certain Indians should not thereafter be subject to any tax, was a contract, and could not be rescinded by a subsequent legislature. It was held that this privilege was annexed to the land, and not to the persons of the Indians, and was a contract in favor of their vendees. It might as well have been said that that privilege was a gratuity, as the one which is so called by the Supreme Court of Arkansas in this case.

The notes in these cases were given in May, 1842. At that time the twenty-eighth section of the charter stood unrepealed, an act which attempted to repeal it not being passed until January, 1845. It is certainly neither denied nor deniable, that, when the notes were given, they were payable, at the option of the debtor, in notes of the bank. They are expressly made payable "in specie or its equivalent," to show that they might be paid otherwise than in specie. As the law then stood, at least, the notes of the State bank were, to our State herself, equivalent to specie. It is too well settled to need argument or authority, that a law which authorizes the discharge of a contract by the payment of a smaller sum, or at a different time, or in a different manner, than the parties have stipulated, impairs the obligation, by substituting for the contract of the parties one which they never entered into, and to the performance of which, of course, they have never consented. Hinkley v. Marean, 3 Mason, 88; Sturges v. Crowninshield, 4 Wheat. 122.

Surely a law which prevents the debtor from discharging a bond in the manner and with the funds with which it could have been discharged when made, — in which it was agreed, when it was made, it might be discharged, — is void for precisely the same reason. The wit of man can observe no difference.

It seems to us that this is a case in which it needs only to apply to the most trite and ordinary principles of law and honesty. *Fides observanda est*, is a maxim older than the law. Upon its observance depend all reverence for government, all respect for authority, all confidence in mankind, all law, and the whole system of morals. If the decision of the court be-

17 *

low is the law of the land, and a true application of the
national Constitution, let *Punica fides* cease to be a proverb.
That such a doctrine could be announced anywhere among
us goes far to prove that America was first discovered and
peopled by the Phœnicians.

The conduct of nations is governed by the same rules of
morality and honesty that govern individuals. The day has
gone by, at least on this continent, when power can sanction
and justify iniquity. Might no longer makes right. Thanks to
our national Constitution, a new code of national morality has
sprung into existence; and it is no longer possible for a State,
even if she be *plenâ fide* a sovereignty, to violate her solemn
pledges, and make her firmest faith as cheap as the empty
wind.

One is grieved and ashamed to be compelled to argue a
question like this in the nineteenth century, and under a free
government. Perhaps it would have been better to say, with
Judge Story, in Thorndike *v.* The United States, 2 Mason,
1: — " By the statutes of the United States, under which
treasury-notes have from time to time been issued, it is enact-
ed, that all such notes shall be receivable in payments to the
United States, for duties, taxes, and sales of public lands, to
the full amount of principal and interest accruing, due on such
notes. It follows, of course, that they are a legal tender in
payment of debts of this nature due to the United States, and
by the very tenor of the act public officers are bound to receive
them."

*Mr. Sebastian* for the defendant in error laid down the fol-
lowing propositions : —

That the twenty-eighth section of the charter was not a con-
tract within the meaning of the prohibitory clause of the Con-
stitution of the United States.

That it was simply a law, in its just and legitimate sense,
and as such repealable by the legislature at any time.

The most important question which arises, and at the very
threshold of the case, is whether the stipulation of the twenty-
eighth section of the charter of the bank was a contract. That
a law in form may in reality be a contract, is admitted; that it
may partake of both features and perform both functions, is
denied. It must be one or the other. Law is a rule, not com-
pact. One is a command of the supreme power, and an exer-
cise of authority; the other is the agreement of the parties, and
the exercise of will. The one is supreme, because it ema-
nates from the sovereign power; the other is obligatory, be-
cause of the assent of the parties. The contracts of the State

are valid, not because they are acts of the sovereign power, in a legislative form, but because they are its compacts for a consideration with others, as a corporate person.   In this last respect, the State is not sovereign; not more than she is when a corporator, partner, stockholder, or trustee.   No doubt, if a State in form of law make a grant, deemed an executed contract, she may not resume it.   If she in the same form make a contract with individuals, when it is accepted it is equally obligatory, and under the protection of the Constitution.   Such was the doctrine of this court in Fletcher v. Peck, 6 Cranch, 87.   And in New Jersey v. Wilson, 7 Cranch, 164.   These latter cases, however, quoted by appellants, have no bearing in this case, as they are instances in which the contract was express, conveyed property rights, and left no doubt from their nature that they were contracts.   It is not believed that this court has ever in this class of cases gone beyond the protection of vested rights of property from resumption.   No case has ever pushed this doctrine any further.   Rights of the character just mentioned never, indeed, needed the protection of the Constitution, and most probably never, in point of fact, entered into the intention of its framers.   They exist not under the Constitution, but above it, and independent of it.   Still, beyond this class, the courts have not construed laws to be contracts, except in the charters of private corporations, which stand upon a different footing, and of which I shall say more hereafter.   The principle has been extended to its utmost tension, and cannot go further, without an undue and unnecessary restraint upon the rights of the States in the regulation of their civil institutions and policy adopted for their internal government.   Such was not intended, as is admitted in Dartmouth College v. Woodward.   It would be of most mischievous consequence, if every law which promised a general benefit or advantage, which indicated a particular policy, or ventured upon an untried experiment, should be deemed a compact with the citizen to adhere to it for ever.   The legislation of a State would be fettered by so many restraints, that it would become a mere register of its contracts, rather than a code of its laws.   It would only be potent for mischief, and impotent for good, possessing the strange faculty of perpetuating evil, without the power to arrest or correct it.   To give stability to law, it is not necessary to perpetuate its mischief.

It is admitted that, when a contract is clearly expressed or necessarily implied, no considerations should induce its violation; but then the opposite extreme should be avoided, by which too sacred a regard is paid to private right, and too little to public necessity.   This prohibition being in derogation and

restraint of the rights of legislation of the States over subjects peculiarly within their sphere, should be, if not strictly construed, at least warily watched, lest it go further than any necessity warrants. Much more so, when in this case the prohibition is sought to be extended to the almost utter annihilation of State sovereignty. Every State, of necessity, must be left undisturbed in the exercise of these powers, essential to its preservation and safety. Among these, the chief one is the power over its finances and credit, of laying and collecting taxes. So essential is this, that it is almost impossible to conceive of a government without a treasury. Upon the full enjoyment of this prerogative depends the faithful performance of all the functions which devolve upon a State. Without it, how can government be established or maintained, its credit preserved, its depts paid, its obligations discharged, its laws administered, and its trusts performed? How impotent for self-preservation is the State, when, under the pressure of an overruling necessity, she resorts to every resource and every power, calls upon every arm and every purse, if she must stay the last mighty struggle for existence until she redeems all the issues of a defunct and insolvent bank. There are periods in the history of every nation when laws and constitutions are inadequate and feeble for their task, when resort must be had to that brief code, " *Salus republicæ, suprema est lex.*" It is the law of necessity. Constitutions are built upon it. They may suspend, but can never subvert it. What state has never found a period when she did not resort to it? What nation that has not found the preservation of faith inconsistent with its necessities? In plainer terms, What nation has not suspended or repudiated her obligations? And where are the countless millions of Continental money, which the necessities of the Revolution forced into circulation, and which the poverty of its exchequer as quietly buried in oblivion? May not a nation legitimate its own bankruptcy, as well as that of the citizen?

When the prohibition of the Constitution is to be extended in restraint of a necessary and essential power of State sovereignty,—the control of its revenue and the performance of its trusts,—it may be justly expected that it should be to protect a clear and an undoubted right from violation. These principles were asserted in a most forcible manner by the Chief Justice in an analogous case of Providence Bank *v.* Billings and Putnam, 4 Peters, 514. Speaking of the taxing power, he says, —" As the whole community is interested in retaining it undiminished, that community has a right to insist that its abandonment ought not to be presumed in a case in which the deliberate purpose of the State to abandon it does not appear."

The power of collecting taxes and prescribing the manner in which they may be paid, is a most essential part of the taxing power. These principles were again distinctly approved in Charles River Bridge *v.* Warren Bridge, 11 Peters, 547. A useful illustration of the mischief from such provisions being regarded as contracts, and the highest evidence that it was not so intended, are afforded in the very case before the court. The bank was authorized by its charter to issue $ 3,000,000 upon its $ 1,000,000 of capital. The State revenue ordinarily amounts to less than $ 100,000 per annum. In the event of a total insolvency of the bank (and it has nearly approached that), the revenues of the State would have been absorbed for years, besides the utter swallowing up of every trust fund with which the munificence of Congress had invested her. The Seminary, Five per Cent., Salt Springs, Common Schools, Distribution, and Internal Improvement funds, all would have been swept away ; potent evidence that the *trust* funds were not meant by " debts due the State."

It is difficult to conceive how any law, in the administration of which the citizens may be interested, may not as well be considered a contract as the twenty-eighth section of the charter. It certainly possesses the same *indicia* of contracts. We have but to say, that the law prescribing a thing to be done, is a pledge that it shall be done, and the conversion is complete. Such is the case with all the laws for the administration of justice, the collection of revenues, and the regulation of the internal police of the State. In all these, certain duties are imposed upon the public officers as the agents of the States. Yet these laws are subject to repeal, and often inflict inconvenience and disappointment. The law in question is but a direction of the State to the treasurer, prescribing the character of funds which he may receive for her revenues ; and it would be strange, indeed, if any such law was not, from its very nature, repealable. In one sense, the twenty-eighth section was no part of the charter ; it found a place among the enactments which constituted the law of the corporation. It formed no part of the law of its being ; it was a part of the fiscal regulations and revenue laws of the State, and as such might well be altered, modified, or altogether repealed, whenever the public good required it. It contained no pledge to the bank ; that was a public corporation in which the State was sole proprietor, and alone interested. It was none to the government of the bank, for they were public officers of a public " civil institution," employed in the administration of the government, who might, with the corporation which they governed, have been instantly, at any moment, annihilated by a total repeal.

It conferred no immunity, franchise, or privilege. It contained no pledge to the bond holders who advanced the capital of the bank. As to them, the seventeenth section of the charter gave them only a pledge of the faith of the State for the principal and interest of the capital alone. As to the holder of the notes, it was the pledge which every law contains, that it will be executed while in force, and no longer. That the provision thus enacted formed a contingent and auxiliary consideration, in giving currency and value to the notes of the bank, may be true. That it was the object and aim of the law, is not to be believed. It facilitated the collection and disbursement of the public revenue, while the bank remained the fiscal agent and depositary of the State. Had the bank been without a cash capital, it might be presumed that the State by this means sought to lend credit to its notes, and then they would have been within the meaning, if not the spirit, of " bills of credit." They derived their legal and permanent value from their being the bills of a specie-paying bank, with a cash capital, resources, and property of its own, amenable in court, and tangible to an execution. The Constitution only authorized the General Assembly to pledge "the faith of the State to raise the funds necessary to carry into operation the bank." This was done. Nothing beyond this was either done or intended to be done. It might with equal truth be asserted, that other provisions of the charter, which gave to the notes of the bank a contingent value, were also contracts with the note-holder, such as the deposit of the various trust funds of the State, the revenues of the State, the Internal Improvement fund afterwards acquired by the State, the duration of the charter, the franchises, powers, and privileges of the bank. These were all contingent and remote auxiliaries, which lent additional confidence to the public in the resources of the bank. Yet it is not denied that they were not contracts. These provisions were all subsequently repealed without question. But for the act of 1845, the revenues of the State would to this day have been collected, and the whole of the public creditors paid, as for years previously they had been in the depreciated notes of this institution.

Again, this section had all the *indicia* of a law, none of a contract. Law, according to the most comprehensive and intelligible definition, " is a rule of civil action, prescribed by the supreme power of a State, commanding what is right, and prohibiting what is wrong"; or, according to a definition less technical, " commanding what shall be done, and prohibiting what shall not be done." It is a command from a superior to an inferior, to do or not to do. When addressed to the citizens at large, it forms the civil jurisprudence of a country;

when it is directed to the public officers of the State, it forms its public and political law. All laws creating public, municipal, or political corporations, are of this class, over which the legislative power of a State is not restrained by the Constitution. They, from their nature, must be repealable, without any other limitation than that property held by such corporations shall be still secured for the use of those for whom, and at whose expense, it has been acquired. Dartmouth College *v.* Woodward, 4 Wheat. 518. "The character of civil institutions does not grow out of their incorporation, but out of the manner in which they are formed, and the objects for which they are created. The right to change them is not founded on their being incorporated, but on their being the instruments of government, created for its purposes." "The same institutions, though not incorporated, would be public institutions, and of course controllable by the legislature." Ibid. 638.

The distinction between public and private corporations was thus defined:—"If a charter be a mere grant of political power; if it create a civil institution, to be employed in the administration of the government; or if the funds be public property alone, and the government alone be interested in the management of them, the legislative power over them is not restrained by the Constitution." It thus possessed all the features of a law. The whole charter was but law. On the contrary, this provision contained no portion of a contract. Law only becomes compact when it requires and obtains the assent of the other parties to it. It has been shown that the only legal value of the notes of the bank was as obligations of the bank. The quality which they possessed from being receivable at the State treasury was incidental, and, like a legal quality or privilege imparted to any other estate or property, could be withdrawn at the pleasure of the State. As obligations of the bank, they could not be reached by a legislative repeal of the charter.

Mr. Justice McLEAN delivered the opinion of the court.

This case is before us on a writ of error to the Supreme Court of Arkansas.

An action was brought by the State of Arkansas in the Pulaski Circuit Court, against the plaintiff in error, and his sureties, Chester Ashley and others, upon his official bond as late Treasurer of State, for the recovery of a certain sum of money alleged to have been received by him, as treasurer, between the 27th day of October, 1836, and the 26th day of December, 1838. And a judgment was recovered against him and his securities, on the 13th of June, 1845, for $3,359.22

and costs. An execution having been issued on the judgment, on the 24th of February, 1847, the plaintiff tendered to the defendant in error, who prosecuted the suit as Attorney-General, the full amount of the judgment, interest, and costs, in the notes of the Bank of the State of Arkansas, which were refused.

The above facts being stated in a petition to the Supreme Court of Arkansas on the 25th of February, 1847, an alternative mandamus was issued to Trapnall, the defendant in error, to receive the bank-notes in satisfaction of the judgment, or show cause why he shall refuse to do so.

On the return of the mandamus, the defendant admitted the judgment and tender of the notes; but alleged that he was not authorized to receive them in satisfaction of the judgment, because the twenty-eighth section of the bank charter, under which alone the plaintiff could claim a right so to satisfy the judgment, was repealed by an act of the legislature, approved January 10th, 1845.

It was agreed by the parties, that the record of the judgment should be made a part of the proceeding; that the defendant was the proper officer by law to receive satisfaction of the judgment; that the notes tendered were issued by the bank prior to the year 1840, and that down to the year 1845 the notes of the bank were received and paid out by the State, in discharge of all public dues; that the bank continues to exist with all its corporate functions.

The court were of opinion, that the return of the defendant showed a sufficient cause for a refusal to obey the mandate of the writ, and gave judgment accordingly.

The twenty-eighth section of the bank charter, which was repealed by the act of 1845, provided "that the bills and notes of said institution shall be received in all payments of debts due to the State of Arkansas." And the question raised for consideration and decision is, whether the repeal of this section brings the case within the Constitution of the United States, which prohibits a State from impairing the obligations of a contract.

The bank charter was passed on the 2d of November, 1836, " with a capital of one million of dollars, to be raised by a sale of the bonds of the State, loans, or negotiations, together with such other funds as may now or hereafter belong to, or be placed under the control and direction of, the State"; the principal bank to be located at the city of Little Rock, and its concerns to be conducted by a president and twelve directors, to be appointed by a joint vote of the General Assembly. Branches were required to be established, the presidents and directors whereof were to be elected in the same manner.

The president and directors were to have a common seal, were authorized to deal in bullion, gold, silver, &c., purchase real property, erect buildings, &c., issue notes, make loans at eight per cent. on indorsed paper, or on mortgages, within the State; a general board was constituted, who were to make report of the condition of the bank annually, to the legislature, and perform other duties; and any debtor to the bank, "as maker or indorser of any note, bill, or bond, expressly made negotiable and payable at the bank, who delays payment," should have a judgment entered against him on a notice of thirty days.

Some doubt has been suggested, whether the notes of this bank were not bills of credit within the prohibition of the Constitution. We think they cannot be so held, consistently with the view taken by this court in the case of Briscoe *v.* The Bank of the Commonwealth of Kentucky, 11 Peters, 311. It was there said, that, "to constitute a bill of credit within the Constitution, it must be issued by a State, on the faith of the State, and be designed to circulate as money. It must be a paper which circulates on the credit of the State, and is so received and used in the ordinary business of life."

The bills of this bank are not made payable by the State. A capital is provided for their redemption, and the general management of the bank, under the charter, is committed to the president and directors, as in ordinary banking associations. They may in a summary manner obtain judgments against their debtors. And although the directors are not expressly made liable to be sued, yet it is not doubted they may be held legally responsible for an abuse of the trust confided to them.

The entire stoc of the bank is owned by the State. It furnished the capital and receives the profits. And, in addition to the credit given to the notes of the bank by the capital provided, the State declares in the charter, they shall be received in all payments of debts due to it. Is this a contract? A contract is defined to be an agreement between competent persons, to do or not to do a certain thing. The undertaking on the part of the State is, to receive the notes of the bank in payment from its debtors. This comes within the definition of a contract. It is a contract founded upon a good and valuable consideration; a consideration beneficial to the State, as its profits are increased by sustaining the credit, and consequently extending the circulation, of the paper of the bank.

With whom was this contract made? We answer, with the holders of the paper of the bank. The notes are made payable to bearer; consequently every *bonâ fide* holder has a right, under the twenty-eighth section, to pay to the State any debt he may owe it, in the paper of the bank. It is a continuing

guaranty by the State, that the notes shall be so received. Such a contract would be binding on an individual, and it is not less so on a State.

That the State had the right to repeal the above section may be admitted. And the emissions of the bank subsequently are without the guaranty. But the notes in circulation at the time of the repeal are not affected by it. The holder may still claim the right, by the force of the contract, to discharge any debt he may owe to the State in the notes thus issued.

It is argued that there could have been violated or impaired no contract with the plaintiff in error, as it does not appear he had the notes tendered by him in his possession at the time the twenty-eighth section was repealed.

It is admitted that he had the notes in his possession at the time he made the tender, and that they were issued by the bank before the repeal of the section; and nothing more than this could be required.

The guaranty of the State, that the notes of the bank should be received in discharge of public dues, embraced all the bills issued by it; the repeal of the guaranty was intended, no doubt, to exclude all the notes of the bank then in circulation. Until the repeal of the twenty-eighth section, the State continued to receive and pay out these notes. Up to that time, no one doubted the obligation of the State to receive them. The law was absolute and imperative on the officers of the State. The holder of the paper claimed the benefit of this obligation, and it is supposed his right could never have been questioned. The notes were payable to bearer, and the bearer was the only person who had a right to demand payment of the bank, or to pay them into the State treasury in discharge of a debt. The guaranty included all the notes of the bank in circulation as clearly as if on the face of every note the words had been engraved, "This note shall be received by the State in payment of debts." And that the legislature could not withdraw this obligation from the notes in circulation at the time the guaranty was repealed, is a position which can require no argument. Any one had a right to receive them, and to test the constitutionality of the repeal.

Suppose a State legislature should pass a law authorizing the drawers of promissory notes, payable to bearer, to discharge the same by the payment of produce. Would such a law affect the rights of the bearer? The contract would stand, and the law would be declared void. A standing guaranty by a mercantile house, to receive in payment of its debts all notes drawn by a certain other house, is valid, on the ground that the notes were taken on the credit of such guaranty. It may

be terminated by a notice; but when so terminated, are not all the notes good against the guarantors, which were executed and circulated prior to the notice? Who could commend the justice of guarantors, who should endeavor to avoid responsibility, on so clear a principle? Louisville Man. Co. v. Welch, *post*, 461.

A State can no more impair, by legislation, the obligation of its own contracts, than it can impair the obligation of the contracts of individuals. We naturally look to the action of a sovereign State, to be characterized by a more scrupulous regard to justice, and a higher morality, than belong to the ordinary transactions of individuals. The obligation of the State of Arkansas to receive the notes of the bank, in payment of its debts, is much stronger than in the above case of individual guaranty. The bank belonged to the State, and it realized the profits of its operations. It was conducted by the agents of the State, under the supervision of the legislature. By the guaranty, the notes of the bank, for the payment of debts to the State, were equal to gold and silver. This, to some extent, sustained their credit, and gave them currency. Loans were made by the bank on satisfactory security. The debts of the bank, or a large proportion of them, may fairly be presumed to have been collected. But the means of the bank, thus under the control of the State, became exhausted. Whether this was the result of withdrawing the capital from the bank, by the State, does not appear upon the record. We only know the fact, that its funds have disappeared, leaving, it is said, a large amount of its paper, issued before the repeal of the guaranty, worthless, in the hands of the citizens of the State.

The obligation of the State to receive these notes is denied, on the ground that the twenty-eighth section was a general provision, liable to be repealed, at any time, by the legislature. And it is compared to a general provision to receive, for public dues, the paper of banks generally, unconnected with the State. There is no analogy in the two cases. One is a question of public policy, influenced by considerations of general convenience, which every one knows may be changed at the discretion of the legislature. But the other arises out of a contract incorporated into the charter, imposing an obligation on the State to receive, in payment of all debts due to it, the paper of a bank owned by the State, and whose notes are circulated for its benefit. The power of the legislature to repeal the section, the stock of the bank being owned by the State, is not controverted; but that act cannot affect the notes in circulation at the time of the repeal.

It is objected, that this view trenches upon the sovereignty of the State, in the exercise of its taxing power and in the reg-

ulation of its currency. We are not aware that a State has power over the currency farther than the right to establish banks, to regulate or prohibit the circulation, within the State, of foreign notes, and to determine in what the public dues shall be paid.

It is a principle controverted by no one, that, on general questions of policy, one legislature cannot bind those which shall succeed it; but it is equally true and undoubted, that a legislature may make a contract which shall bind those that shall come after it.

The notes of the bank in circulation at the repeal of the twenty-eighth section, if made receivable by the State in discharge of public dues, may so far resuscitate them, as that, in the course of time, they will find their way into the treasury of the State, where in justice and by contract they belong. It is presumed there will be no complaint, as there will be no ground for any, by the citizens of the State, if these notes, now dead and worthless, should be so far revived as to reach their appropriate destination. And if, as a consequence, some increase of taxation should be required by the State, it will be nothing more than is common to all other States that perform their contracts. It would be a most unwise policy for a State to improve its currency through a violation of its contracts. In such a course, the loss of the State would be incomparably greater than its gain. Any argument in commendation of such an action by a State cannot be otherwise considered than as exceedingly infelicitous and unjust.

If these notes be receivable in payment of public dues by the State, having been in circulation at the time of the repeal of the above section, as we think they clearly are, no doubt can exist as to the sufficiency of the tender. The law of tender, which avoids future interest and costs, has no application in this case. The right to make payment to the State in this paper arises out of a continuing contract, which is limited in time by the circulation of the notes to be received. They may be offered in payment of debts due to the State, in its own right, before or after judgment, and without regard to the cause of indebtment.

Whatever may be the demerits of the plaintiff in error, they do not affect the nature and extent of the obligation of the State. And that obligation cannot be withdrawn from this paper. Into whosesoever hands it shall come, it carries with it the pledge of the State to receive it in payment of its debts. In this case the payment is made by the securities of Woodruff, and exacted by the State, to whose organization and management of the bank may be attributed its insolvency. In procuring the notes of the bank, these securities had a right to

rely, and no doubt did rely, upon the guaranty of the State to receive them in payment of debts.

In sustaining the application for a mandamus, the Supreme Court of the State exercised jurisdiction in the case. To that court exclusively belongs the question of its own jurisdiction. For the reasons stated, the judgment of the Supreme Court is reversed, and the cause is remanded for further proceedings to that court, as it may have jurisdiction, in conformity to the opinion of this court.

Mr. Justice CATRON, Mr. Justice DANIEL, Mr. Justice NELSON, and Mr. Justice GRIER dissented.

Mr. Justice GRIER.

With all respect for my brethren, I feel constrained to express my entire dissent from the opinion of the majority of the court, which has just been delivered.

There is no portion of the power and jurisdiction committed to this court which demands so much caution in its exercise, as that of declaring the legislation of a State to be null and void, because it comes in conflict with the Constitution of the United States. And more especially should this be the case where one of the States of this Union is really (though not nominally) the true party defendant, and is charged, not merely with legislation injuriously impairing contracts between her citizens, but with a direct and dishonest repudiation of her own solemn obligations. Such is the charge on which the State and people of Arkansas have been publicly arraigned before this court. But it is one I am unwilling to indorse or believe, without other evidence than the record before us contains. When a State is charged with a repudiation of her contracts, the party making it is bound to show, beyond dispute, that the State has made a contract; when, where, how, and with whom; and not leave it to surmise, strained inferences, or fanciful construction, as to the nature of the obligation, or the parties to it.

Assuming the State of Arkansas to be, for the purposes of this case, a private corporation, or an individual, and bound by the same principles of law and equity which affect other persons in their intercourse with the world, let us examine whether William E. Woodruff, the plaintiff below and in error, has shown a contract which entitled him to the remedy sought, in the Supreme Court of Arkansas, and which we are now called on to afford him. The record shows that his bond was given to the State of Arkansas on the 27th of October, 1836, before the act was passed which incorporated the Bank of the State of Arkansas. His contract, as it appears on the face of his bond, is

18*

to pay $ 300,000, " lawful money of the United States," subject
to a condition which is forfeited.   He was treasurer of the State,
and between the date of his bond and the 21st of December,
1838, he received large sums of money, and among others, the
sum of $ 286,757.49, in drafts from the Secretary of the Treasury
of the United States.   Of these moneys a balance remained in
his hands, which he refused to pay over, and a suit was brought
on his bond in 1840 ; and on the 23d of January, 1847, final judg-
ment was recovered for the sum of $ 3,359 and costs ; and an
execution having issued for the same, Woodruff, for the first time,
in February, 1847, tendered to the attorney of the State, not
lawful money of the United States, which he had contracted to
pay, and for which judgment was given against him, but notes
of the State Bank of Arkansas, then and now insolvent, and the
notes almost worthless.   Woodruff then petitioned the Supreme
Court for a mandamus to compel the attorney of the State to
receive these worthless notes, in place of the money he had con-
tracted to pay, and which he was condemned by the judgment
of the court to pay ; and because of the refusal of the Supreme
Court of Arkansas to issue a peremptory mandamus, he has ap-
pealed to this court to compel them, on the ground that the law
of the State which forbade its officers to receive payment of
taxes and debts in anything but specie or par funds, impaired the
obligation of contracts.   The twenty-eighth section of the act
of 1836, incorporating the bank, directed that the bills and notes
of the bank should " be received in all payments of debts due to
the State of Arkansas."   But another statute, passed in 1845,
enacted, that " from and after the 4th of March, 1845, nothing
shall be received in payment of taxes or revenue due the State,
but par funds or Treasury warrants of the State."

Now, for seven years and upwards after the default of the
plaintiff in paying over money which he had received, he was
permitted to pay in notes of this bank, but in all this time he
made no tender of payment in such notes.   When sued on his
bond, he makes no tender of notes, pleads no set-off, but, after
judgment of the court that he shall pay money, he claims a right
to satisfy the execution by handing over that which is not
money.   If this claim be not just, it has at least the merit of
novelty, as it is certainly without precedent, either in the courts
of England or America.

Let us assume, for argument's sake, that every enactment of
the legislature of Arkansas is in the nature of a contract or
promise with *some person*, and cannot be repealed, and that the
State had guarantied or indorsed every note issued by the
bank, or, what will make the case stronger for the plaintiff,
that his bond was made payable in the notes of the State Bank

of Arkansas. Is he entitled to the extraordinary process now demanded, or had he a right to allege such contract on the part of the State at this stage of the proceedings? If he had not, and the court below were right in refusing to issue the mandamus, whether the act of 1845 was void or valid, he has no right to call upon this court to reverse their judgment, because they may have given a wrong reason for it, and unnecessarily passed their opinion on the validity of an act which did not affect the plaintiff's case, or leprive him of any right.

If a creditor gives public notice to his debtors that he will accept, in payment of his debts, wheat, tobacco, or Arkansas notes, and his debtor for a course of seven years refuses or neglects to accept of the offer, and tender payment in such articles, and is afterwards sued upon his bond or note; and even after suit brought makes no such tender, or pleads his readiness to pay in such articles, and judgment is obtained against him on his bond for money due; can he afterwards ask a court to allow him to tender payment in any thing else than money, or have a rule on the plaintiff's attorney or a mandamus, to compel him to accept notes of a broken bank, or other specific articles, in payment of an execution issued on the judgment? Again, if the obligation sued upon is payable in specific articles, and no tender of them is made before suit brought, or plea that the defendant is ready and willing to pay according to contract, and the court give judgment against the debtor for a certain sum of money, as damages for his breach of his contract, can he afterwards compel the sheriff or the plaintiff's attorney to accept specific articles in satisfaction of a judgment and execution for money? And again, if a defendant hold notes drawn or indorsed or guarantied by the plaintiff, he may plead them as a set-off, and obtain judgment in his favor. But if he enter no such plea, or demand no such set-off, and judgment is entered against him for the money due, can he purchase the plaintiff's notes after judgment, and ask the court to compel the plaintiff's attorney to accept them in payment? It does not appear, nor have the learned counsel asserted, that such is the peculiar law of Arkansas, and it certainly is not the law anywhere else.

When suit is brought on a contract, it becomes merged in the judgment; if the defendant claims a right to pay it in any thing else than money, he must plead it and set it up on the trial; for the court, on an action for money, can give judgment only for the payment of money. If, after trial, verdict, and judgment, the plaintiff on motion could raise a new question as to set-off, tender, or a right to satisfy his debt in some other way than by payment of money, the judgment of a court, instead of being the end of controversy, would be but the beginning of litigation.

Of this, the present case is a most flagrant instance. The plaintiffs in error were sued on their bond in 1840, on an obligation to pay "lawful money of the United States." They contested the claim in court for seven years, never alleged by plea or otherwise any contract on the part of the State by which they were entitled to pay in any thing but money, never tendered notes of the Bank of Arkansas, never alleged that the State was liable as guarantor of the notes of the bank, and bound to accept them as a set-off or in payment, but after final judgment affirmed in a court of error, and execution issued, they commence a new litigation, which has now lasted for four years more.

If a citizen of Arkansas had sued the defendants on their bond, and thus had claimed the right to tender payment of it in any thing else than money, owing to some promise or contract of the plaintiff to accept the paper of a particular bank in payment of his bond, no lawyer can pretend that the defendants were not bound to make their defence on the trial, or that, after judgment to pay money, any court has the power to compel the plaintiff to accept any thing else. That a sovereign State has not the same rights in a court of justice that are granted to her humblest citizens, is a doctrine that I have not heard advanced, and do not feel bound to disprove. And yet, if the Supreme Court of Arkansas had issued the peremptory mandamus asked by plaintiff, they would have assumed a power over the sovereign State which the law would not allow them to exercise over any of her citizens. The Constitution of the United States forbids any State "to make any thing but gold and silver a tender in payment of debts"; yet it is claimed that this court has the power to compel a State to accept payment of a judgment for $3,000 lawful money of the United States, in worthless paper of a broken bank; or, in other words, in a collateral proceeding to set aside and reverse the judgment of the court condemning the defendants to pay money, and let them into a defence on some alleged contract of the defendant to guaranty the notes of a certain bank, or to accept payment in something else than money; and thus try the defence after judgment. If courts of justice have such a power, it would seem that this is the first instance in which they have been called upon to exercise it, as the books of reports can furnish no precedent of such a proceeding.

Thus far I have considered this case on the assumption, that the State of Arkansas, by her direction to her officers to receive payment of debts due to her in the notes of the bank, have become the guarantors and indorsers of such notes, and have thereby divested themselves of all power to lay and collect taxes payable in any other medium or currency than notes

of the bank, and irrevocably made them a sufficient tender to her for all debts due, and shown, as I think, that the court below were justifiable in refusing to the plaintiff the writ prayed for in his petition. Let us now inquire whether there is any such contract between the parties in this case, which has been impaired by the legislation of the State. For it is well settled, that the plaintiffs have no right to invoke the aid of this court, to exercise the high power intrusted to them, of deciding on the validity of State legislation, unless some rights vested in them by contract with the State, or some other person, have been impaired or destroyed thereby. I admit that if the defendant, as treasurer of the State, had received debts or taxes due the State in the notes of the bank before the repeal of this law directing him to receive them, it would be a gross violation of their contract to refuse to receive from him such currency or specific articles as he had received in pursuance of law. But that is not the case before us. On the contrary, the bond given by the plaintiff was antecedent to the incorporation of the bank; their contract with the State was to pay "lawful money of the United States," and the subsequent act cannot be said to be incorporated in it, or make a part of their contract. The treasurer received for the use of the State money, not notes of the bank, as the record shows. They do not pretend that after the passage of the act, or even after its repeal up to the time that judgment was obtained against them, they ever held a dollar of these bank-notes, or ever tendered a payment of their debt in them. Where, then, is the contract with these plaintiffs, or how has it been impaired? If other persons have received these notes on the faith of their guaranty by the State, and their value has been diminished or destroyed by the refusal of the State to receive them in payment of their dues, what right have the plaintiffs to complain, or to come to this court for aid? Who is attempting to commit a fraud, or deny the obligation of their contracts, the State of Arkansas, or the plaintiffs themselves? For seven years after this balance was due from the treasurer (from 1838 till 1845), he was permitted to pay it in notes of the bank; but he refused to accept the offer. The bank becomes insolvent, the offer to receive payment in its worthless paper is withdrawn. And two years afterwards, and after the plaintiffs are condemned to pay their debt according to their covenant, in lawful money of the United States, after an execution has issued to compel a compliance with the judgment of the court, they ask this court to annul their contract and the judgment of the Supreme Court of Arkansas, that they may pay their debt in depreciated paper bought up for the purpose. It seems to me,

that if the charge of fraudulent disregard of their contract be imputable to either of the parties in the argument, so far as it affects the contract between them, it is not the State which is justly liable to it, but the plaintiffs. The repeal of the twenty-eighth section of the act incorporating the bank, if it impaired the obligation of a contract with any person, certainly did not add to or change the obligation given by the plaintiffs, or impair it any respect. If it was a contract at all, it was with the corporation. So far as it affected the plaintiffs, it was a gratuitous offer and direction or permission to the treasurer to receive, accept, and pay over debts due the State in a specific article not money, nor a legal tender as such. There is no complaint that the State ever refused to receive from the treasurer taxes or debts received by him in this currency, under this permission or direction of the act. For the seven years that he was permitted to pay his own debt in that medium, he refused to accept of the offer. If a wealthy creditor, for the purpose of sustaining the credit of a particular bank, publishes to the world that, if his debtors will pay him in notes of that bank, he will accept them, and after the bank fails gives notice that he will no longer receive them, can a debtor who for seven years has refused to accept this offer, and pay his debts in the manner proposed, allege that this is a contract binding on the creditor for ever? Can he allege that this offer to receive payment in a specific article, unaccepted by him, has changed the nature of his bond, and that a demand of payment according to the letter of his obligation impairs any contract between them? Such a doctrine as regards the contracts of individuals has never been advanced in a court of justice. And why a different rule should be applied to contracts when a sovereign State is one of the parties, has certainly not been explained.

It needs no argument to demonstrate that a contract must have at least two parties, and that all laws made by a sovereign State are not necessarily contracts, and therefore irrevocable. The act of the legislature of Arkansas under consideration is entitled, "An Act to incorporate the Bank of the State of Arkansas." It creates a corporation and confers certain powers and privileges upon it. So far as it does this, as has been decided by this court, the act may be considered in the nature of a contract, and that these powers and privileges cannot be annulled or withdrawn, without the consent of the artificial power thus created, or the individuals for whose benefit the franchise was granted. It is true, also, that when a law is in the nature of a contract or grant, and absolute rights have vested under that contract, a repeal of the law cannot divest

those rights. But the plaintiffs in this case are not corporators, or stockholders in the bank; they hold no franchise, powers, or privileges, under the act of incorporation; they are no parties to the contracts, nor have they any vested rights under it, which have been impaired by the repeal of the twenty-eighth section. If the corporation, or those who claim the franchises and powers granted to it, do not complain of an infringement of their contract, no other person can. As to them, it is a mere speculative question, which this court is not bound to decide. So far as it affected the plaintiffs, the twenty-eighth section was but a gratuitous offer to accept notes in place of gold and silver, if they would pay their debt, a mere license at the pleasure of the State if not accepted by them. To call it a grant, or vested right under a contract, seems to me a perversion and abuse of terms. But admitting that the directions given in this act to her public officers to deposit the funds of the State in this bank, and receive its paper in payment of its debts, constituted a part of the contract with the corporation, and could not be repealed, did it bind the State after the corporation ceased to perform the functions and duties imposed upon it? If a State creates a banking corporation with a certain capital, and requires it to pay its notes in specie on demand, and agrees to make it a depositary, and use and receive its notes as cash, is the State bound by its contract to do so, when the corporation fails or refuses to fulfil the duties and purposes of its creation. If such be the case, it is certainly a one-sided contract; there is no mutuality in it. Does it make any difference in the case, also, whether the stock of the corporation is furnished by the State or individuals? In neither case are the stockholders individually liable for the mismanagement or defaults of the corporation, unless previously made so by the act of incorporation. The State of Arkansas furnished one million of dollars as the stock upon which this banking corporation was to issue notes and discount paper. She has nowhere agreed to guaranty the solvency of the bank, or be liable for its issues. If individuals had furnished the stock, they would not be personally liable for its debts. If the stockholders had all made deposits of their money in the bank, and received interest on long deposits, and received its notes as gold and silver, it would not have amounted to a contract with the public, or note-holders, or any body else, that they should continue to deposit their money or receive its notes in payment of debts after the bank became insolvent and its notes worthless. The most refined legal *astutia* has thus far been unable to discover in such conduct of individuals an implied promise to receive broken bank notes in payment of debts, or a liability to the

note-holders, because their conduct had given credit to the bank. But it seems there is a more stringent rule of morality with regard to sovereign States and their contracts. In their case, under some fiction of the law, without regard to the fact or their actual undertaking, there has been discovered an implied contract running with the paper, like a covenant running with land, which renders them liable for all the issues of the bank, into whosesoever hands it may come, and for ever disables them to lay or collect a tax, or pay a debt, till they have lifted and paid every note of the broken bank in which they were stockholders, although they never directly pledged the faith of the State, or agreed to be liable for a single dollar issued by the bank. If individuals had furnished the one million of dollars capital under an act of incorporation which did not make the stockholders personally liable, every person who received the notes would do it on the credit of the capital paid in. Why it should not be the same case when a State furnished the capital, I am unable to perceive. Nor can I comprehend how a direction by a State to its officers to make deposits in a bank, and receive its notes in payment of debts, amounts *per se* to a contract running with the notes, which binds the State to receive them for ever, whether the corporation be solvent or insolvent, dead or alive. But the liability of the State for these issues is argued and attempted to be proved by another legal fiction; to wit, that the State is the bank, and the bank is the State. And why? Because she created the corporation? No; for that would make her liable for the paper of every corporation created by the legislature.

It is, then, because she is owner of the stock, receives the profits, makes the bank her depositary, and gives credit to its notes by ordering them to be received in payment of her debts. And it is from this doctrine of identity, that this contract of guaranty, running with the paper, has been inferred, or rather imputed to the State. If the same identity exists when individuals stand in the same relation to a corporation, and the same contract of guaranty be imputed to them (and I can see no reason why it should not), it is strange that no traces of the doctrine can be found in our books of reports.

But there are certain inferences which necessarily follow as corollaries from this decision in this case, and certain doctrines for which it may be quoted as a precedent (although not directly asserted), that confirm me in refusing my assent to it.

1st. That if the same rules of law for the interpretation of contracts, and the rights of the parties to them, affect all persons, whether natural or artificial, the individual and the sovereign State, it may fairly be inferred hereafter, that, when a bond or

Woodruff v. Trapnall.

note, payable in specific articles, is sued upon, the defendant is not bound either to tender them, or plead a tender, but, after judgment for a sum of money, he may make payment to the sheriff of the execution in specific articles, and not in money.

2d. That, after a court has solemnly adjudged that the defendant shall pay to the plaintiff a certain sum of money, they can compel him to receive in lieu of it worthless rags.

3d. That a defendant, who has been condemned by the judgment of a court to pay to the plaintiff a sum of money, may buy up notes drawn or indorsed by the plaintiff, and by mandamus or rule of court compel the plaintiff's attorney to accept them in payment.

4th. If these consequences are not legitimately to be inferred from this judgment, then it necessarily follows, that this court exercise a controlling power over sovereign States, and judgments obtained by them, which they cannot exercise over the humblest individual or petty corporation.

5th. That this court has the power to compel any State of this Union, who repudiates her debts, to pay them, because such refusal or repudiation impairs the obligation of her contracts.

6th. That so long as any portion of the three millions of dollars of notes issued by this bank before 1845 remains unpaid, the State of Arkansas cannot collect a dollar of taxes from her citizens in lawful money.

7th. That the courts have a right to compel a State to pay bank notes guarantied by them, before and in preference of all other debts.

8th. That the collectors of taxes, so long as any of this issue of bank-notes can be found, may buy them up at the rate of one dollar for ten or a hundred, and have the assistance of the court to compel the State to receive them at par, even where the collector has received gold and silver.

9th. That when a State, a corporation, or an individual publish to the world their willingness to accept payment of their debts in the issues of a bank, it amounts to a contract, by implication, with the public, and each individual composing it, to guaranty the notes issued by said bank, and that this contract runs with, and is attached to, said notes, in the hands of the bearer, provided the notes were issued before such offer is withdrawn.

As I cannot assent to any one of these propositions, and as I believe they are legitimate deductions from the decision of the court, I beg leave to express my dissent from it.

Mr. Justice CATRON.

I concur in .the dissenting opinion just delivered by my brother Grier.

Mr. Justice DANIEL.

I dissent from the decision of the court in this case, and entirely concur in the arguments and conclusions expressed in the opinion delivered by my brother Grier.

### *Order.*

This cause came on to be heard on the transcript of the record from the Supreme Court of the State of Arkansas, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Supreme Court in this cause be, and the same is hereby, reversed, with costs, and that this cause be, and the same is hereby, remanded to the said Supreme Court for further proceedings to be had therein, in conformity to the opinion of this court.