A. W. SHAFFER *v*. DAVID A. JENKINS, Public Treasurer.

The money in the Public Treasury is within the exclusive control of the General Assembly; and no Court of this State has authority to compel the Public Treasurer to pay an admitted debt of the State, against an express and positive prohibition of the General Assembly on the Treasurer to pay such debt.

PETITION for a MANDAMUS, heard before *Tourgee, J.*, at January (Special) Term, 1874, of WAKE Superior Court.

The petition was for a peremptory *mandamus*, to be directed to the defendant, as Treasurer, commanding him to pay the amount of certain warrants to the plaintiff.

His Honor gave judgment for the plaintiff, and thereupon the defendant appealed.

All the facts necessary to an understanding of the points raised and decided, are stated in the opinion of the Court.

*Attorney General Hargrove* and *Smith & Strong*, for appellant.

*Fowle*, contra.

RODMAN, J. By an Act ratified 11th March, 1869, (Acts of 1868–'69, chap. 72,) it was enacted, that there should be laid out and established a turnpike road through the lands of the Educational Fund, from the head of North River, in Carteret county, to the head of Adams' creek, in Craven county. That the Superintendent of Public Works should appoint a surveyor and commissioners to locate the road, and upon their report, should let out the construction of the road, and appoint a superintendent of the work. The Act appropriated $5,000 for the construction of the road, to be paid by the Public Treasurer, on the warrant of the Governor, and directed the Governor to issue his warrant for the payment of the contractors, from time to time, whenever the Superintendent of Public Works and the agent for construction, should certify to him, that any one or more sections had been com-

pleted and received. It does not appear that any work whatever was done upon the road, or that the Superintendent of Public Works and the agent for construction ever so certified to the Governor, though it may be assumed that they did. On the 1st June, 1870, the Governor drew a warrant on the Public Treasurer, in favor of Abraham Congleton, for $710, purporting to be drawn under the Act aforesaid. On 21st June, 1870, he drew a similar warrant in favor of W. A. Moore, for $705, and on the 6th July, 1870, another in favor of Congleton for $1,075. These warrants were countersigned in the name of the Auditor by his clerk, and were shortly after their dates presented to the Public Treasurer, who refused to pay them then, on the ground that he had at that time no money in the treasury applicable to the claims. He further said, that he expected in some short time, to have money which he might so apply, and he would then pay them.

Afterwards, the warrants were assigned for value to the plaintiff by Congleton and Moore. The plaintiff several times applied to the Treasurer for payment, which was not made. On the 13th December, 1871, the General Assembly by a resolution (Acts 1871–'72, p. 390,) directed the Treasurer not to pay these or any similar warrants. After this, he absolutely refused to do so, and this action was brought asking for a *mandamus* to compel him to pay them.

In determining this case, we cannot give any weight to the promises to pay, which it is said were made by the Treasurer. How far he may be bound as an individual by such promises, is not pertinent to the question before us. The Treasurer is a public officer, who has no power over the moneys of the State, except such as is given to him by some Act of Assembly, and no promise of his binds the State. Admitting, for the sake of argument, that this Court would have jurisdiction to compel him to pay a debt of the State which he was required by law to pay, we think we have no right to require him to pay a claim which the General Assembly (as we must suppose, for a sufficient reason,) has expressly directed him not to pay. This of

course is admitted by the plaintiff to be true in general. In answer to it, however, it is said for him :

1. That the claim of the plaintiff arises out of a contract with his assignors, which the State could not repudiate, and that the Resolution of December, 1871, is therefore void and the Act 1868–'69 still retains its full original force.

2. That the warrant of Governor Holden is conclusive proof that Congleton and Moore were contractors to construct the road, and that they did actually perform their contracts, so as to entitle themselves to payment.

3. That the payment of the warrant was a mere ministerial duty on the Treasurer, which the proper Court should enforce.

It is proper to observe somewhat on each of these propositions.

*As to the first and second,* which may well be considered together. It is conceded that the provision in the Constitution of the United States, that no State shall pass any law to impair the obligation of contracts, applies as well to a contract to which the State is a party, as to one between individuals. But it must also be conceded, we think, that no Court has jurisdiction to enforce the performance of an executory contract against a State.

But we do not understand that the General Assembly has undertaken to repudiate any contract which it may have made with Congleton and Moore for the construction of this road. It must be open to a State, as it is to an individual, to deny that any contract was made, and also to deny that the contract has been performed on the part of the other party, so as to give him a rightful claim against the State. On the trial of this case in the Court below, the defendant offered evidence to prove, that in fact no part of the road had been constructed, and that consequently the warrant of the Governor must have been obtained by fraud and false representations. It is open to an individual, and it must be equally open to the State, to show that an acknowledgement of indebtedness, has been procured by fraud and imposition on him, or on his agent, if the ac-

knowledgement was made by an agent; and also to show a fraudulent combination between the claimant and the agent. His Honor, the Judge below, refused to receive any evidence of the fraudulent character of the claim, considering the warrant of the Governor as a conclusive acknowledgement of indebtedness on the part of the State. We concur with his Honor in considering the evidence immaterial in this particular action, not however for the reason which appears to have governed him, but for the reason (which will be presently discussed,) that no Court of this State has jurisdiction to take money out of the treasury of the State, to pay even an admitted debt of the State, against an express and positive prohibition of the General Assembly on the Treasurer to pay such debt. In an action by the plaintiff against the State, (which the Constitution allows,) we conceive that this evidence would be pertinent and admissible.

Before leaving this part of the subject, it is proper to say, that we have not noticed the fact that the warrant in question was countersigned by the Auditor, because we conceive that such counter-signature did not add to the force and effect of the warrant. For the same reason it is unnecessary to consider whether the Auditor is a judicial officer, and whether his powers can be exercised by deputy.

We come then to, *the third proposition of the plaintiff.* In support of this, he relies on the cases of *Cotton* v. *Ellis*, 7 Jones 545, and *Bailey* v. *Caldwell*, 68 N. C. 472. In the first of these cases, this Court did apparently order a *mandamus* to the Governor and Public Treasurer, commanding them to pay a claim against the State which the General Assembly had substantially declared illegal.[1] In the case of *Mauran, Adjutant General* v. *Smith, Governor*, 7 Rhode Island R. 192, (in 1865,) in which the Court considered its power to issue a *mandamus* to the Governor to perform a statutory duty, it says: "In North Carolina, *Cotton* v. *Ellis*, the Court decided in favor of the jurisdiction, and for any thing that appears, issued the writ, being the only instance which we find reported

in which the writ may have issued against a Governor, except where he consented to the jurisdiction, for the sake of getting the opinion of the Court upon the merits of the relation."

The learned Court perhaps overlooked the concluding part of the opinion in *Cotton* v. *Ellis*, from which it appears that the Governor did in that case consent to the jurisdiction, in order to obtain the opinion of the Court on the merits of the relation. Such we know was the case also in *Bailey* v. *Caldwell*. These cases therefore are not authorities in favor of the jurisdiction of a Court to issue a mandamus *in invitum* against a Governor. And whenever that question shall be presented the learned opinion of the Supreme Court of Rhode Island, adverse to such a jurisdiction, will deserve respectful attention. These observations on these cases, are made only to show that they are not authorities bearing on the question before us.

Assuming that a Court of the State has jurisdiction to enforce by the writ of *mandamus* the performance by the Public Treasurer, of a ministerial duty imposed on him by statute, yet these case are not authorities, that such Court may enforce a payment of money forbidden by a statute, upon the ground that the statute forbidding payment is unconstitutional.

Cases may perhaps be found to the effect, that a Court may exercise such a jurisdiction. And we will not undertake to say that there may not be cases in which it may properly do so. But this is not one of those cases. The resolution of December, 1871, did not impair the obligation of any contract. It denied the indebtedness of the State under the contract, if there was one, and left that question to the Court having jurisdiction of such questions under the Constitution, in which the merits of the claim may be inquired into. We cannot doubt that if the plaintiff shall establish the justice of his debt before the constitutional tribunal, the General Assembly will accept the decision, and provide for its payment.

However this may be, the money in the Treasury is within the exclusive control of the General Assembly. No Court can undertake to administer it. To do so would produce confu-

sion, and the result might be to have the State without the means of paying the officers of the government, which would thus fall to pieces.

There are cases no doubt, in which a Court has undertaken to enforce the obligations of a State, and has more or less directly, put its hand upon the money in the State Treasury. *Woodruff* v. *Trapnall*, 10 How. 190.

But we conceive that those cases go no farther than this. If the Legislature by way of contract, has specifically appropriated a certain fund, to a certain debt, or to a certain individual, or class of individuals, and the State Treasurer having that fund in his hands, refuses to apply it according to the law, he may be compelled to do so by judicial process.

If any case goes farther than this, we conceive that it cannot be supported on principal, and that it oversteps the just line of demarcation between the legislative and judicial powers.

PER CURIAM. Judgment below reversed, and judgment that defendant go without day.