## VASHON v. GREENHOW.

The head-note for this case will be found on page 664, *ante.*

MR. JUSTICE BRADLEY, continuing, stated the case as follows:

The remaining case which we have to consider is that of *Vashon* v. *Greenhow.* This case arose upon the refusal of Greenhow, treasurer of the city of Richmond, to receive from Vashon tax-receivable coupons in payment, or part payment, of taxes due from him, including a certain amount due for school taxes for the maintenance of the public free schools of the State. Upon this refusal Vashon filed a petition for a mandamus in the hustings court of the city of Richmond, stating that he was a taxpayer of the said city, and was indebted to the State for state taxes of 1884 to the amount of $35.63, and tendered to Greenhow, the said treasurer, in payment therefor, certain coupons cut from the bonds of the State issued under the act of March 30, 1871 — one of the denomination of thirty dollars and one of the denomination of three dollars, said coupons being past due, and being presented to the court with the petition; that he, at the same time, offered to pay the treasurer the whole of said tax in legal-tender notes and coin, and demanded that the treasurer receive said coupons along with said legal-tender notes and coin for the purpose of identification and verification in manner and form as required by the act of January 14, 1882. The petition further alleged that by virtue of the State's contract to receive said coupons in payment of said taxes, and by virtue of the act of assembly aforesaid, he was entitled, upon the payment of his said tax in money, to have his said coupons received for identification and verification, and pay his tax therewith; wherefore he prayed a writ of mandamus commanding said Greenhow, treasurer of said city, to receive the said money and also the said coupons, and commanding him to forward said coupons to the court for identification and verification according to law. A rule to show cause having been granted, the treasurer filed his answer to the petition, in which he stated the truth to be that Vashon was indebted to the State for taxes for the

year 1884, as follows, to wit : for tax on property the sum of $35.63, being $9.66 for the maintenance of public free schools, as per exhibit attached to the answer. He further stated and admitted that the petitioner offered to pay the said tax in money at the same time that he demanded the respondent to receive the coupons mentioned in the petition for the purpose of identification and verification. The answer then proceeds as follows :

" Your respondent avers that he was willing to receive the payment of said tax in money, but refused to receive and receipt for so much of the coupons as were offered in payment of that portion of the tax set aside by law and dedicated to the maintenance of the public free schools of the State.

" Your respondent assigns the following reasons for such refusal :

" (1) The Constitution of Virginia provides, in section 7 of article VIII, what specific sums shall be set apart as a permanent and perpetual literary fund, and includes in it such other sums as the General Assembly may appropriate.

" (2) Section 8 of the same article provides that the General Assembly shall apply the annual interest on the literary fund and an annual tax upon the property of the State of not less than one mill nor more than five mills on the dollar, for the benefit of the public free schools.

" (3) In pursuance of this constitutional authority the General Assembly has provided, in acts of 1883–4, p. 561, that on tracts of lands and lots a tax of ten cents on every hundred dollars of the assessed value thereof shall be levied, which shall be applied to the support of the public free schools of the State.

" (4) Again, the last General Assembly, in acts of 1883–4, p. 603, have provided that all taxes assessed on property, real or personal, and dedicated to the maintenance of the public free schools of the State, shall be paid and collected only in lawful money of the United States, and shall be paid into the treasury to the credit of the free school fund, and shall be used for no other purpose whatsoever.

" Your respondent avers that to have forwarded such of the

coupons as were offered in payment of the tax dedicated to the public free schools would have been a violation of the Constitution and the laws above referred to.

"For these reasons your respondent insists that he ought not to have forwarded, for the purpose of identification and verification, so much of the coupons as were tendered in payment of that portion of the tax dedicated to the public free schools.

"He therefore prays that the writ of mandamus may be denied and the petition dismissed with costs."

To this answer the petitioner entered a demurrer, which was sustained by the court and a peremptory mandamus was awarded pursuant to the prayer of the petition. The case being carried to the Supreme Court of Appeals of Virginia the judgment was reversed, and this judgment of reversal is now before us for review.

*Mr. William L. Royall* for plaintiff in error.

The question to be determined is, which will this court follow — the series of decisions of the old court, holding the funding act to be consistent with the Constitution of the State, or the decision of the new court, holding that act to be void, as being in conflict with the Constitution of the State.

If the act is consistent with the Constitution of the State, then the act of March 15, 1884, which forbids payment of part of the tax in coupons, clearly impairs the obligation of the State's contract that they shall be received in payment of all taxes due to the State. It is the settled and familiar law of this court that when the question is whether a state law authorizing an issue of bonds is repugnant to the Constitution of that State, and there have been conflicting decisions of the highest court of that State, this court will follow the first decision of that State's court on that question, instead of the last. *Gelpcke* v. *Dubuque*, 1 Wall. 175 *Kenosha* v. *Lamson*, 9 Wall. 477; *Lee County* v. *Rogers*, 7 Wall. 181; *Havemeyer* v. *Iowa County*, 3 Wall. 294; *Mitchell* v. *Burlington*, 4 Wall. 270; *Olcott* v. *Supervisors*, 16 Wall. 678; *Taylor* v. *Ypsilanti*, 105 U. S. 60.

It is also the settled and familiar law of this court that when the question to be determined is whether a state statute, making a contract, is repugnant to the Constitution of that State, this court will determine that question for itself, without regard to what the highest court of that State may have decided in regard to it. *Jefferson Branch Bank* v. *Skelly*, 1 Black, 436; *University* v. *People*, 99 U. S. 309.

Now, it is hardly possible for this court, after the many times it has held these coupons to be binding contracts, to hold now that they are void. I suppose, as a matter of course, that it will adopt the reasoning of Virginia's court in *Antoni* v. *Wright*, 22 Grattan, 833; and *Clarke* v. *Tyler*, 30 Grattan, 134; and I shall therefore discuss the matter no further.

*Mr. R. A. Ayers*, Attorney General of the State of Virginia, and *Mr. J. Randolph Tucker* for defendant in error.

MR. JUSTICE BRADLEY, continuing, delivered the opinion of the court.

The Court of Appeals placed their judgment upon two distinct grounds. In the first place, they reviewed the former judgments of that court which had sustained the act of March 30, 1871, as a valid and constitutional enactment and binding upon the State as a contract with the bond and coupon holders under the same. The court were of opinion that these decisions were based upon a mistaken assumption that the State had received a consideration for the issuing of the bonds created by the act aforesaid. They argued and attempted to show that the State had not received any consideration whatever, but that the issuing of the bonds under the act of 1871 was a mere gratuity on the part of the State, and was not binding upon it so as to prevent the legislature from abrogating the conditions of that act. We have already indicated our views with regard to this position taken by the Supreme Court of Appeals, and have referred to the decisions made by this court sustaining the validity of the act of 1871, which decisions of this court we regard as binding upon us.

The other ground on which the Court of Appeals placed its decision was, that the act of 1871, as applied to the moneys due and payable to the "literary fund," or fund for the maintenance of public free schools, was contrary to the constitution of the State, adopted in 1869. The 7th and 8th sections of the eighth article of that constitution declare as follows:

"SEC. 7. The General Assembly shall set apart, as a permanent and perpetual literary fund the present literary funds of the State, the proceeds of all public lands donated by Congress for public school purposes, of all escheated property, of all waste and unappropriated lands, of all property accruing to the State by forfeitures, and all fines collected for offences committed against the State, and such other sums as the General Assembly may appropriate.

"SEC. 8. The General Assembly shall apply the annual interest on the literary fund, the capitation tax provided for by this constitution for public free school purposes, and an annual tax upon the property of the State of not less than one mill nor more than five mills on the dollar, for the equal benefit of all the people of the State. . . ." 2 Constitution and Charters, 1968.

The court, in its opinion, held that in view of these constitutional provisions the legislature had no power to declare, or contract, that the moneys due to the literary fund might be paid in coupons attached to the bonds authorized by the act of 1871; and that such a payment would be repugnant to the very nature of the fund. It might well be added, that coupons thus paid into the fund would be of no value whatever to it, for as soon as paid into the treasury they would become valueless as if cancelled and destroyed, unless some provision were made for their reissue, and the putting of them into renewed circulation. This would be opposed to the whole tenor of the act, would be unjust to the coupon holders themselves, and would probably be contrary to the acts of Congress in reference to the creation of paper currency. We think that the position of the Court of Appeals in this case is well taken, that coupons could not be made receivable as a portion of the literary fund; and that, if they could not be received as a part

of the fund, they could not properly be made receivable for the taxes laid for the purpose of maintaining said fund. For several years after the constitution was adopted, and after the law of 1871 had been passed, the taxes for the benefit of free schools were mingled in the assessment and collection of taxes, and in the treasury when received, with the other taxes and funds raised for the support of the state government. As long as this state of things continued the collecting officers could not object to receiving coupons in payment of taxes, because the share due to the school fund could easily be paid from the treasury, to the credit of that fund, out of the lawful moneys received. But by the tax act of March 15, 1884, it was provided that all taxes assessed on property, real or personal, by that act, and dedicated by it to the maintenance of the public free schools of the State, should be paid and collected only in the lawful money of the United States, and should be paid into the treasury to the credit of the free school fund, and should be used for no other purpose whatsoever, and to this end the auditor of public accounts should have the books of the commissioner of the revenue prepared with reference to the separate assessment and collection of said school tax, and the several treasurers of the Commonwealth should have the tax bills in their counties and corporations so made out as to specify the amount of the tax due from each taxpayer to the public free school fund, including the capitation taxes of whatever kind or nature, and should keep said capitation tax and school tax separate and distinct from all other taxes or revenues so collected by him, and forward the same, thus separate and distinct, to the auditor of public accounts, which should be kept separate and distinct by him from all other taxes or revenues until paid to the public free schools. Since the passage of this act, and in pursuance thereof, the taxes and other revenues raised for the purpose of maintaining public schools, and belonging under the Constitution to the literary fund, have been kept separate and distinct from the other taxes raised for the general support of the state government. This the practice when the case of *Vashon* v. *Greenhow* arose, and in our judgment the law requiring the school tax to be

paid in lawful money of the United States was a valid law, notwithstanding the provisions of the act of 1871; and that it was sustained by the sections of the Constitution referred to, which antedate the law of 1871, and override any provisions therein which are repugnant thereto.

In *Paup* v. *Drew*, 10 How. 218, a decision was made by this court in a case not very different in principle from the one now under consideration. It had been decided in *Woodruff* v. *Trapnall*, 10 How. 190, at about the same time, that the law of Arkansas which chartered the Bank of the State of Arkansas, (the whole capital of which belonged to the State,) and provided that the bills and notes of said institution should be received in all payments of debts due to the State, was valid and irrepealable, and that, although this provision was subsequently in terms repealed, the notes of the bank which were in circulation at the time of the repeal were not affected by it; and that the undertaking of the State to receive the notes of the bank constituted a contract between the State and the holders of these notes which the State was not at liberty to break or impair, although notes issued by the bank after the repeal were not within the contract and might be refused. After this decision the case of *Paup* v. *Drew* came up, in which it was held that, although the notes of the bank were receivable in payment of all debts due to the State in its own right, and could not be refused, yet where the State sold lands which were held by it in trust for the benefit of a seminary, and the terms of the sale were that the debtor should pay in specie or its equivalent, such debtor was not at liberty to tender the notes of the bank in payment. The question arose in this way : Congress in 1827 had passed an act "Concerning a seminary of learning in the Territory of Arkansas," by which two entire townships of land were directed to be set aside and reserved from sale, out of the public lands within the said territory, for the use and support of a university within the said territory. In 1836, Congress passed another act entitled " An act supplementary to the act entitled 'An act for the admission of the State of Arkansas into the Union, and to provide for the due execution of the laws of the United

States within the same, and for other purposes,'" by which last act the lands so reserved for the use and support of a university were vested in the State of Arkansas.    On the 28th of December, 1840, the legislature of Arkansas passed an act entitled "An act to authorize the governor to dispose of the seminary lands;" and in 1842 the then governor of the State sold to John W. Paup the right to enter and locate 640 acres of said land, and received from him therefor bonds payable at different dates in specie or its equivalent.    In 1847 the governor of the State brought a suit upon these bonds, and the defendants brought into court the sum of $6050 in notes of the Bank of the State of Arkansas, and pleaded a tender of the same in discharge of the debt.    The plaintiff demurred on the ground that the proceeds of the bonds were part of a trust fund committed to the State by Congress for special purposes, over which the State had no power except to collect and disburse the same in pursuance of the objects of the grant, and the State had no power to apply said funds to the payment of ordinary liabilities, and was not bound to accept in payment of such bonds any depreciated bills, bank paper, or issues, even though she might be ultimately liable to redeem them.    This demurrer was sustained and judgment given that the fund was a trust fund held by the State of Arkansas for the purposes to which it was devoted, and therefore the State could not properly contract to receive other than lawful money for property disposed of belonging to said fund.

We think that the principle of this case sustains the decision of the Court of Appeals of Virginia in the case now under consideration, and the judgment of that court is

*Affirmed.*

It may be argued that the principle involved in the last case is equally applicable to all taxes raised for the support of the state government, inasmuch as the funds necessary for that purpose, as well as those raised for the purpose of maintaining public free schools, are required to be paid in cash.    But there is this difference, that the tax for school purposes is set apart for that specific use, under the express requirement of the consti-

Vashon *v.* Greenhow.

tution, whilst the general tax for carrying on the government is, or should be, adequate to meet not only the actual expenses of the government itself, but also the outstanding debts and obligations that may be due and payable during the fiscal year, of which the coupons are themselves a part. If the tender of tax-receiving coupons to any considerable amount is apprehended, the rate of taxation should be raised so as to produce a sufficient surplus over and above such coupons to meet the expenses of the government. If the influx of coupons should be so uncertain that no safe calculation could be made on the subject, an arrangement could probably be made with the coupon holders, for limiting the proportion of tax which would be received in coupons. It is certainly to be wished that some arrangement may be adopted which will be satisfactory to all the parties concerned, and relieve the courts as well as the Commonwealth of Virginia, whose name and history recall so many interesting associations, from all further exhibitions of a controversy that has become a vexation and a regret.